1

```
 1        IN THE UNITED STATES DISTRICT COURT OF THE
              EASTERN DISTRICT OF PENNSYLVANIA
 2                        - - -

 3   NATIONWIDE MUTUAL      :NO. 02CV4830
     INSURANCE COMPANY,     :CIVIL ACTION
              Claimant     :
 4      -vs-                :
     MICHAEL DAILY AND      :
 5   MAUREN REPETTO DAILY,  :
     as parent and as natural:
 6   guardian of William    :
     Repetto, a minor, and  :
 7   in her own right,      :
              Defendants   :
 8

 9                        - - -

10                 Oral deposition of MAUREN

11   REPETTO DAILY, taken pursuant to notice held

12   at Ostroff, Villari and Kusturiss, 311 North

13   Broad Street, Suite 2, Lansdale, PA 19446 on

14   Thursday, January 2, 2003, beginning at or

15   about 2:00 p.m., before Sandra Gordon, Court

16   Reporter and Notary Public there being

17   present.

18                        - - -

     APPEARANCES:
19           GERMAN, GALLAGHER AND MURTAGH
             BY:  PHILIP A. RYAN, ESQUIRE
20           The Bellevue, Suite 500
             200 South Broad Street
21           Philadelphia, PA 19102
             Phone:  (215) 545-7700
22           Representing the Plaintiff

23

24

25
```

EXHIBIT

*A*

PHERION

2

```
1   APPEARANCES:
            OSTROFF, VILLARI AND KUSTURISS
2           BY:  JOHN E. KUSTURISS, ESQUIRE
            311 North Broad Street, Suite 2
3           Lansdale, PA 19446
            Phone:  (215) 362-0300
4           Representing Mauren Repetto Daily

5           DAVID A. JASKOWIAK, ESQUIRE
            222 South Easton Road, Suite 107
6           Glenside, PA 19038
            Phone:  (215) 886-7720
7           Representing Michael Daily

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    A    If Michael picked them up, it was few
2    and far between, but I do not remember him
3    picking them up hardly at all.
4    Q    Why was that?
5    A    It wasn't Michael's job, they weren't
6    his responsibility at the time.
7    Q    Do you know what shift or shifts
8    Michael was working back then?
9    A    He rotated month to month.  Sometimes
10   their father would pick them up.  By our
11   custody agreement, he was supposed to pick
12   them up Mondays and Fridays, I think.  Once
13   again this is going back a long time, so ...
14   Q    And would that be every Monday and
15   every Friday that he was supposed to pick the
16   children up?
17   A    He was supposed to, yes.
18   Q    And what would he do when he picked the
19   children up, did he take him to his place?
20   A    He took them to -- he's the track coach
21   for Garnet Valley.  He took them to Garnet
22   Valley track practice.
23   Q    What's your former husband's name?
24   A    William C. Repetto, The Third.
25   Q    Now, on weeks or months when there
```

20

```
 1    time I've had a problem.
 2    Q       Is he a teacher?
 3    A       He is not.
 4    Q       What does he do when he's not a track
 5    coach?
 6    A       I do not know.  He works for a mail
 7    delivery service.
 8    Q       And do you remember when you and
 9    Michael became engaged?
10    A       December 10th of, I think, 1999.
11    Michael is better at dates than I am.
12    Q       That's consistent with what he said.
13            And as I understand it from Michael's
14    deposition, he moved into your house in
15    Chadds Ford in May of 2000.  Is that
16    approximately right?
17    A       He moved into my house in May of 2000,
18    I don't remember.
19    Q       Do you have any reason to disagree with
20    that?
21    A       No, I have no reason to disagree.  I
22    don't really know what you mean by moved in,
23    but --
24    Q       Well, did it happen in stages?
25    A       It did.  That's -- in my opinion, it
```

1    happened in stages.

2    Q    Pardon?

3    A    In my opinion, it happened in stages.

4    Q    Did you ever have a discussion with

5    Michael where he advised you that he was

6    going to rent or lease his house in

7    Brookhaven to a third party?

8    A    Yes.

9    Q    And do you remember when he leased that

10   house to this third party?

11   A    No.

12   Q    After the period of time when he leased

13   the house to this person, I think it was a

14   woman named Barbara Fisher?

15   A    Right.

16   Q    Is it your understanding that Michael

17   no longer resided in the house in Brookhaven,

18   that he was living full time at your

19   residence in Chadds Ford?

20   A    I suppose that's an accurate statement.

21   Q    Before Michael leased the house to this

22   third person, Ms. Fisher, did the two of you

23   have a discussion as to what the arrangements

24   would be when Michael moved in?

25   A    Yes.

MAUREEN REPETTO DAILY

22

```
1   Q      What was the discussion?

2   A      He paid to me money out of his check to

3   be able to reside there.

4   Q      And was there an arrangement on the

5   amount that he would pay you?

6   A      He left that up to me, I think, and I

7   typically just took a figure monthly that he

8   would give to me to pay the mortgage, the

9   electric and the telephone.

10              MR. KUSTURISS:  How did you

11  compute that figure?

12              THE WITNESS:  I took the

13  mortgage figure and I added my average PECO

14  bill and my telephone bill and divided it by

15  four.  I paid three-quarters of it, and he

16  paid one-quarter of it, and various

17  incidentals, like groceries, I would add in,

18  the internet, now I added in.

19  BY MR. RYAN:

20  Q      How long did this arrangement last?

21  A      Until we got married.

22  Q      And your marriage date was?

23  A      September 29, 2001.

24  Q      Did Michael pay you by check or by

25  cash?
```

27

1  Q     When you said that Michael was doing

2  shift work or rotated shifts on a

3  month-to-month basis, what were the type of

4  shifts?  In other words, was it --

5  A     8:00 AM to 4:00 PM, six days off, six

6  days on, two days off, for a period of four

7  shifts.

8  Q     And then what would he shift to?

9  A     4:00 PM to 12:00 AM, six days on, two

10 days off, for a period of four weeks, and

11 then 12:00 AM to 8:00 AM.

12 Q     Now, when Michael moved into the house

13 in Chadds Ford approximately in May of 2000,

14 were you aware of the fact that he had his

15 mail forwarded to your address there?

16 A     I don't know if I can answer that

17 question.  Was I aware?

18 Q     That he had changed his mailing address

19 to your house?

20 A     He received mail at my address.  I

21 assume that he did it, but I was not involved

22 in change of address for him.

23 Q     Well, would it be fair to say that in

24 the latter part of 2000, and through the

25 first half of 2001, that Michael was

1    receiving all of his mail at your address, to

2    your knowledge?

3    A      Yes.

4    Q      He also, during that period of time,

5    had all of his clothes at your house?

6    A      I don't know if it was all of his

7    clothes.  He had a portion of 4108 still in

8    his possession.

9    Q      Did he ever tell you what he kept

10   there?

11   A      Now that you mention it, no.

12   Q      Just to put your mind at ease, I think

13   that had to do with his business.

14          Do you remember that Michael was

15   registered to vote in Chadds Ford as of the

16   November 2000 election?

17   A      I wouldn't be surprised.

18   Q      From the time -- from roughly May 2000

19   through 2001, did Michael ever buy anything

20   for the children, clothes, toys, gifts?

21   A      Gifts, I would imagine for Christmas

22   and their birthdays.  Clothes, no.

23   Q      Never?

24   A      Unless the gifts were clothes.

25   Q      Anything like just buying them sneakers

29

1   or anything like that?

2   A      No, sir.

3   Q      Did you and Michael and the children go

4   out to dinner together?

5   A      I'm sure we did.

6   Q      And would there be times when Michael

7   would pick up the tab for dinner?

8   A      I guess he did.  I don't know if I can

9   answer that question.  I can't think of a

10  specific outing.

11  Q      Well, was there anything that Michael

12  bought for the house, any items of furniture,

13  any pictures?  Again this would be prior to

14  your marriage.

15  A      I'm going through each room in my

16  house.  No.

17  Q      When Michael moved in, and again this

18  would be approximately May of 2000, did he

19  bring any of his furniture with him from the

20  house in Brookhaven?

21  A      No.

22  Q      No pictures, no --

23  A      He brought the picture that I got him

24  for Christmas.

25  Q      The what?

MAUREEN REPETTO DAILY

30

1    A    The picture that I got him for

2    Christmas, and that's it.  It's a big -- I

3    can't remember the artist's name.  It's a

4    picture of a house.

5    Q    During the summer of 1999, did you go

6    on vacation together?

7    A    1999, not that I can remember.

8    Q    Did you go anywhere on vacation?

9    A    We took one trip to Georgia, but I

10   don't remember what year that was.  And we

11   took a trip to Las Vegas, and I can tell you

12   that that was the -- during the weekend of

13   Holy Thursday, the year 2000.

14   Q    So that would be somewhere around March

15   or April of 2000?

16   A    It was April that year.

17   Q    Was it just the two of you or did you

18   go there with the kids?

19   A    No, the kids didn't come, they stayed

20   home with their father.

21   Q    The summer of 2000, did you take any

22   vacations?

23   A    Maybe down the shore, but nothing

24   remarkable that I can remember.

25        Are you going to remember something

1  that I don't, because I can't remember?

2  Q    We have our ways.  When you say you

3  went down to the shore, did you rent a place

4  at the shore for any extended period of time?

5  A    I believe the only time we went was

6  actually a client of mine, his father, let me

7  stay at his hotel, the VIP in Wildwood.

8  Q    Did you go down there with the kids?

9  A    Yes.  I did go down with the kids by

10  myself.  Mike had to work.

11  Q    This is when you stayed in the friend

12  of the client's or whatever?

13  A    I think so.

14  Q    No other vacation that you can think

15  of?

16  A    No.

17  Q    On weekends or on his days off, would

18  Michael engage in any activities with the

19  children?

20  A    He attended Billy's hockey games, and

21  he would go watch Nicole play soccer, if she

22  was playing.

23  Q    Are those the only sports that the kids

24  participated in?

25  A    And Nicole plays basketball.

MAUREEN REPETTO DAILY

33

1    the years since 1999?

2    A    I think it's changed more since the

3    baby.  But, yeah, it changed more after we

4    got married too.  After we got married he was

5    more of a disciplinarian.

6    Q    What was the birth date of the baby

7    again?

8    A    July 30th, and the reason why I pointed

9    that out is because it's not a daddy-issue.

10   They call daddy -- I mean, they call Mike,

11   daddy.  They call Michael, Michael, and

12   always have.  Now, the baby is starting to

13   say dada, and the kids are trying to make

14   sure that they don't call him Mike too much

15   in front of the baby, that's why I think it

16   feels a little closer, but that's the only

17   difference.

18   Q    Has there ever been any discussion of

19   Michael adopting your other two children?

20   A    No, sir, no.

21   Q    Well, during the beginning of 2001,

22   again this would be within eight or nine

23   months of your marriage, was Michael more

24   engaged or involved in the disciplining of

25   the children or supervision of the children?

37

```
 1   A     One bank account we established in
 2   joint names from down at the beach.  Wait,
 3   this is before marriage, right?  In or about
 4   August of 2001, we had purchased a house down
 5   the beach, and while we were down the beach,
 6   we figured we should have an account in
 7   Wilmington Trust, and we put it in our names.
 8   Q     Prior to that time, had you ever
 9   intermingled your money?
10   A     Intermingled aside from --
11   Q     Well, besides what you have already
12   described about the money that Michael would
13   give you on a monthly basis?
14   A     Did we ever intermingle?  No, he became
15   a signature on my account at one time, and I
16   became a signature on his account at one
17   time.  I have a separate account for my kids,
18   which is where the child support check goes,
19   that's under Mauren Callahan, my maiden name,
20   and then I had the Sovereign account.  He had
21   a Sovereign that he closed, and he has his
22   Sun East account.
23         On the Sovereign account and the Sun
24   East account, we're both signatures.  And I'm
25   not sure when that went into effect, but our
```

MAUREN REPETTO DATIA

38

```
 1   funds never intermingled.  His paycheck
 2   always went into Sun East, and he gave me an
 3   amount for the home account.
 4   Q     Did you ever jointly apply for credit
 5   cards before September 2001?
 6   A     No, sir.
 7   Q     What were the child-care arrangements
 8   during the summer of, I guess, 2000?
 9   A     Bill Repetto, their dad, takes them for
10   two consecutive weeks, typically to Virginia.
11   I took them away usually for a week.  And the
12   child-care arrangements, I know that Ron
13   Johnson watched them a lot, but I can't
14   remember if that was 2000 or 2001 because
15   Ron's retired.
16   Q     During the summer of 2000 when Michael
17   was working either evenings or the graveyard
18   shift, would he be responsible for the care
19   of the children when you were at work?
20   A     I'm trying to think who watched them,
21   because Mike would sleep during the day on
22   his 12:00 AM shift.  Could I look at this
23   real quick?  We're in the summer of 2000,
24   right?  Oh, they were at Holy Child Camp.
25   They went to Holy Child Smart Soccer Camp for
```

1  one or two weeks.  That was the Smart Soccer

2  Camp that lasted all day.  They would do

3  activities with that, and then I signed them

4  up, and then they would go with their dad for

5  two weeks, and then with me for a week, and

6  then typically back to camp.

7  Q     What is it you're looking at right now?

8  A     I have a kids' checkbook that I only

9  write the kids' money to pay for their food

10 and their child care and their flute lessons

11 and their piano lessons and all that stuff.

12 Q     Why do you maintain a separate account

13 for the kids?

14 A     I do.

15 Q     I said why?

16 A     Why?  Because that's their father's

17 responsibility and mine, it's not Michael's

18 responsibilities.

19 Q     When was that account set up?

20 A     This printout goes back to August of --

21 oh, you know what, August of 1999.  I

22 probably had it longer than that.  This is my

23 Quickened program that I didn't get until --

24 it's Quickened '99.  So it probably starts

25 about the time I purchased it, but I've

45

```
 1   accident?  Legal, in terms of court-imposed
 2   duties by way of foster care orders or that
 3   kind of thing?
 4   A      No, sir.
 5   Q      Who was your home insurance company at
 6   the time of the accident?
 7   A      Allstate Insurance Company.
 8   Q      And was your car also insured with
 9   Allstate?
10   A      That's correct.
11   Q      Do you get a discount for them both
12   together, is that how it's supposed to work?
13   A      That's how it's -- right.
14   Q      And if you had a second car on that
15   policy, that car ultimately would have also
16   been entitled to a discount?
17   A      Yes.
18   Q      Michael had his own car insurance at
19   the time of this accident?
20   A      That's correct.
21   Q      And he had his own insurance policy for
22   Brookhaven, correct?
23   A      That's correct.  And I might add that
24   it's different companies altogether.
25                 MR. JASKOWIAK:  Right.
```

MICHAEL DAILY

STATEMENT

| | |
|---|---|
| WILLIAM REPETTO, | ) STATEMENT UNDER OATH |
| Plaintiff, | ) OF |
| - vs - | ) MICHAEL DAILY |
| NATIONWIDE INSURANCE, | ) |
| Defendant. | ) |

- - - - - - - - - - - -

TRANSCRIPT OF SWORN STATEMENT, taken by and before DANIELLE GORMAN, Certified Professional Reporter and Notary Public, at the offices of KENNETH SCHUSTER & ASSOCIATES, P.C., 334 West Front Street, Media, Pennsylvania, on Tuesday, May 28, 2002, commencing at 9:31 a.m.

REPORTING SERVICE ASSOCIATES, INC. (RSA)
1845 Walnut Street - 15th Floor
Philadelphia, Pennsylvania  19103
(215) 241-1000

COPY


EXHIBIT
B

3e2ac6c3-82c4-11d6-88e4-009027a6908f

MICHAEL DAILY

2

```
 1    A P P E A R A N C E S:

 2

 3          OSTROFF, VILLARI & KUSTURISS, P.C.
            BY:  JOHN KUSTURISS, JR., ESQUIRE
 4           311 North Broad Street
              Lansdale, PA  19446-2457
 5               Attorneys for the Plaintiff

 6

 7          GERMAN, GALLAGHER & MURTAUGH
            BY:  PHILIP RYAN, ESQUIRE
 8           The Bellevue
             Fifth Floor
 9           200 South Broad Street
              Philadelphia, PA  19102
10               Attorneys for the Defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

3e2ac6c3-82c4-11d6-88e4-009027a6908f

MICHAEL DAILY

20

1    Q.      For I guess the November of 2000

2    election do you remember where you voted?

3    A.      That's what I'm trying to remember

4    right now.  I think I voted in Garnett

5    Valley.

6    Q.      In where?

7    A.      In Garnett Valley, Concord Township.

8    Q.      Which is the Chaddsford area?

9    A.      Yes, that was the Chaddsford address.

10   Q.      Now, at some point in time after you

11   pretty much moved out of Woodland Avenue and

12   were living at the Robins Way address -- and,

13   again, this would be roughly May of 2000 or

14   so -- did you start sharing expenses with

15   Maureen?

16   A.      Yes, I guess.  Did we could mingle

17   money?  No.  She would tell me what my

18   monthly stipen would have to be and I'd write

19   her a check.  I wrote all my own bills.  We

20   didn't combine money until just August of

21   2001 really.  Maybe prior to that we bought

22   another house, but we didn't really commingle

23   any money.

24   Q.      When you say she told you how much

3e2ac6c3-82c4-11d6-88e4-009027a6908f

MICHAEL DAILY

21

1   your monthly stipen was, would that indicate

2   that you just wrote her a single check to

3   cover expenses?

4   A.      Yes, monthly I would write her a

5   check, maybe 700, 900, 1,000, whatever that

6   would be.

7   Q.      From that Maureen would pay --

8   A.      Electric, gas --

9   Q.      -- utilities?

10  A.      -- water.  Yes.  Sorry.

11  Q.      Prior to May of 2001 what was your

12  role in terms of the care of the children?

13  Were you involved at all in taking care of

14  Billy or Nicole?

15  A.      Yes, pick them up from school now and

16  again, dinner.

17  Q.      Again, basically from May of 2000 to

18  May of 2001, did you have a routine about

19  when -- would someone drop the kids off at

20  school, would someone pick them up from

21  school?

22  A.      There's no routine.  I work shift

23  work.  It bounces all over.  Primarily

24  Maureen pictures them up.

3e2ac6c3-82c4-11d6-88e4-009027a6908f

MICHAEL DAILY

27

1    she got together with the Mizell guy it

2    became more infrequently.  But I would stop

3    there once a week, I would have to do

4    something with the equipment in the garage or

5    in storage.

6    Q.      When you would stop once a week,

7    would you actually go in the house or were

8    you just working in the garage?

9    A.      Sometimes I would go in the house if

10   she was home.  They had a dog.  I didn't like

11   it.  So, I didn't mess with the dog, the dog

12   didn't mess with me.

13   Q.      Did you and Maureen have any common

14   bank accounts prior to May of 2001?

15   A.      No, not jointly named.  We didn't

16   commingle funds until the summer of 2001 or

17   close to -- there's a law.  I didn't realize

18   there was a banking law regarding that, 30

19   days prior to getting married or something.

20   Q.      Prior to May 2001, do you remember

21   spending any money at all with regard to the

22   care or needs of Billy or Nicole?

23   A.      Yes.  I would buy them things and

24   take them to dinner.

3e2ac6c3-82c4-11d6-88e4-009027a6908f

*(Attach Declarations and Endorsements Here)*

5. "Motor vehicle" means:

    a. a motorized land vehicle including motorized bicycles or mopeds designed for travel on public roads or subject to motor vehicle registration. A vehicle in dead storage on an insured location is not a motor vehicle.

    b. a trailer or semi-trailer designed for travel on public roads and subject to motor vehicle registration.

    c. a motorized golf cart, snowmobile or other motorized land vehicle owned by an insured and designed for recreational use off public roads, while off an insured location. A motorized golf cart while being operated to or from, or on the premises of a golf course is not a motor vehicle.

    d. any vehicle while being towed by or carried on a vehicle defined in 5a, 5b or 5c.

6. "Property damage" means physical injury to or destruction of tangible property.

    This includes resulting loss of its use.

7. "Residence employee" means an employee of an insured who performs duties in connection with maintenance or use of the residence premises. This includes household or domestic services or similar duties elsewhere not in connection with the business of an insured.

8. "Residence premises" means the one- or two-family dwelling, other structures and grounds; or that part of any other building where you live, shown as the residence premises on the Declarations.

9. "Occurrence" means bodily injury or property damage resulting from:

    a. one accident; or

    b. continuous or repeated exposure to the same general condition.

10. "Aircraft" means any machine or device capable of atmospheric flight, except models.

## SECTION I—PROPERTY COVERAGES

## COVERAGE A—DWELLING

We cover:

    a. the dwelling on the residence premises shown on the Declarations and mainly used as a private residence, including attached structures and attached wall-to-wall carpeting.

    b. materials or supplies on or adjacent to the residence premises for use in construction, alteration or repair of:

        (1) the dwelling; or

        (2) other insured structures on the residence premises.

## COVERAGE B—OTHER STRUCTURES

We cover other structures on the residence premises. They must be separated from the dwelling by clear space. Structures connected to the dwelling by only a fence, utility line, or similar connection are considered other structures. The limit of liability for this coverage is stated on the Declarations.

We do not cover other structures:

    a. used in whole or in part for business purposes.

    b. rented or held for rental to anyone, unless used solely as a private garage.

## COVERAGE C—PERSONAL PROPERTY

We cover personal property owned or used by an insured at the residence premises. At your request, we will cover personal property owned by others. It must be on the part of the residence premises occupied by an insured. We will also cover, at your request, personal property owned by a guest or residence employee. This applies only in a residence occupied by an insured.

Our limit of liability for personal property while away from the residence premises is 10 percent of the limit of liability for Coverage C or $1000, whichever is greater. Personal property in transit to, or in, a newly acquired principal residence is not subject to this limit for 30 days. The 30 days start right after you begin to move the property. This limit does not apply to: personal property removed from the residence premises due to a covered loss.

EXHIBIT

C

EXHIBIT

Lipton 6
5-8-03 wb

 **NATIONWIDE INSURANCE** Nationwide is on your side

**ELITE II POLICY DECLARATIONS**
Non-Assessable

Page 1 of 3

These Declarations are a part of the policy named above and identified by policy number below. They supersede any Declarations issued earlier. Your Elite II Policy will provide the insurance described in this policy in return for the premium and compliance with all applicable policy provisions. See policy for details regarding the other coverages and additional coverage options.

**Policy Number:**
58 37 MP 148785

**Issued:**
FEB 05, 2001

**Policyholder:**
(Named Insured)
MICHAEL DAILY
4108 WOODLAND AVE
BROOKHAVEN PA 19015-1626

**Policy Period From:**
MAR 06, 2001  to MAR 06, 2002  but only if the required premium for this period has been paid. and only for annual renewal periods if premiums are paid as required. Each period begins and ends at 12:01 A.M. standard time at the Residence Premises.

**The Following Change(s) Have Been Made To Your Policy:**

The limit of liability for Section I Coverage A Dwelling is revised.

**Residence Premises Information:**

4108 WOODLAND AVE
BROOKHAVEN
PA 190151626

ONE FAMILY
FRAME DWELLING
YEAR OF CONSTRUCTION 1955

PROTECTION CLASS 5
RATED PROTECTION CLASS 5
INSIDE SINGLE CLASS AREA
WITHIN 1000 FT FROM HYDRANT
WITHIN 5 MILES FROM FIRE DEPT
FIRE DISTRICT 0021
RIDLEY PARK BOROUGH OF
PROTECTION TERRITORY 097

## SECTION I

| Property Coverages | Limits Of Liability | Deductible: $250 ALL PERILS |
|---|---|---|
| COVERAGE-A-DWELLING | $  117,200 | In case of a loss under Section I, we cover only that part of each loss over the deductible stated. |
| COVERAGE-B-OTHER STRUCTURES | $  11,720 | |
| COVERAGE-C-PERSONAL PROPERTY | $  64,460 | |
| COVERAGE-D-LOSS OF USE | $  117,200 | |

## SECTION II

| Liability Coverages | Limits Of Liability | |
|---|---|---|
| COVERAGE-E-PERSONAL LIABILITY FOR EACH OCCURRENCE: PROPERTY DAMAGE AND BODILY INJURY | $  100,000 | |
| COVERAGE-F-MEDICAL PAYMENTS TO OTHERS EACH PERSON | $  1,000 | |

H5300

EXHIBIT
Lydon-7
5-8-03 ub

FRAME: E 11


EXHIBIT
D

22

```
 1    Q       What was the discussion?

 2    A       He paid to me money out of his check to

 3    be able to reside there.

 4    Q       And was there an arrangement on the

 5    amount that he would pay you?

 6    A       He left that up to me, I think, and I

 7    typically just took a figure monthly that he

 8    would give to me to pay the mortgage, the

 9    electric and the telephone.

10                    MR. KUSTURISS:  How did you

11    compute that figure?

12                    THE WITNESS:  I took the

13    mortgage figure and I added my average PECO

14    bill and my telephone bill and divided it by

15    four.  I paid three-quarters of it, and he

16    paid one-quarter of it, and various

17    incidentals, like groceries, I would add in,

18    the internet, now I added in.

19    BY MR. RYAN:

20    Q       How long did this arrangement last?

21    A       Until we got married.

22    Q       And your marriage date was?

23    A       September 29, 2001.

24    Q       Did Michael pay you by check or by

25    cash?
```

**EXHIBIT**

*E*

29

1    or anything like that?

2    A      No, sir.

3    Q      Did you and Michael and the children go

4    out to dinner together?

5    A      I'm sure we did.

6    Q      And would there be times when Michael

7    would pick up the tab for dinner?

8    A      I guess he did.  I don't know if I can

9    answer that question.  I can't think of a

10   specific outing.

11   Q      Well, was there anything that Michael

12   bought for the house, any items of furniture,

13   any pictures?  Again this would be prior to

14   your marriage.

15   A      I'm going through each room in my

16   house.  No.

17   Q      When Michael moved in, and again this

18   would be approximately May of 2000, did he

19   bring any of his furniture with him from the

20   house in Brookhaven?

21   A      No.

22   Q      No pictures, no --

23   A      He brought the picture that I got him

24   for Christmas.

25   Q      The what?

32

```
 1   Q      Did Michael go to the basketball games?
 2   A      Whenever -- only if he had off and had
 3   a chance to go.
 4   Q      Has Michael ever coached any of the
 5   kids' teams?
 6   A      No, sir.
 7   Q      And how would you describe Michael's
 8   relationship with your children?
 9   A      Now?
10   Q      Well, now, and then has it changed
11   since 1999?
12   A      How it's changed?
13   Q      Yeah.  Well, let's start in 1999.  How
14   was it, say, when you first became engaged in
15   December of '99?
16   A      Relatively distant because -- I don't
17   know how to answer that question.  In 1999,
18   he was more like a buddy to them, I guess.
19   Like he wasn't involved in their discipline,
20   taking them to the practices.  He wasn't real
21   active.  The only thing that makes me say
22   that is, like, the kids would beg him to come
23   to a basketball game, but their father was
24   very frequently there, so Michael did not.
25   Q      And did that subsequently change over
```

MAUREN REPETTO DAILY

33

1    the years since 1999?

2    A      I think it's changed more since the

3    baby.  But, yeah, it changed more after we

4    got married too.  After we got married he was

5    more of a disciplinarian.

6    Q      What was the birth date of the baby

7    again?

8    A      July 30th, and the reason why I pointed

9    that out is because it's not a daddy-issue.

10   They call daddy -- I mean, they call Mike,

11   daddy.  They call Michael, Michael, and

12   always have.  Now, the baby is starting to

13   say dada, and the kids are trying to make

14   sure that they don't call him Mike too much

15   in front of the baby, that's why I think it

16   feels a little closer, but that's the only

17   difference.

18   Q      Has there ever been any discussion of

19   Michael adopting your other two children?

20   A      No, sir, no.

21   Q      Well, during the beginning of 2001,

22   again this would be within eight or nine

23   months of your marriage, was Michael more

24   engaged or involved in the disciplining of

25   the children or supervision of the children?

34

1    A    He didn't become disciplinarian or

2    supervisory or anything like that until after

3    our marriage.

4    Q    From the time that Michael moved in in

5    approximately May of 2000, were the two of

6    you sharing a bedroom?

7    A    Yes.

8    Q    And how many bedrooms are there in your

9    house?

10   A    Four.

11   Q    From the time that Michael moved in,

12   was he involved in doing any chores around

13   the house, cutting the grass, shoveling snow,

14   taking out the trash, doing household

15   maintenance-type things?

16   A    He mowed the lawn.  We have a tractor

17   that he rides a lot, it keeps him out of the

18   house, that's all.

19   Q    How large is your lot?

20   A    Three-quarters of an acre.

21   Q    Was that tractor previously owned by

22   Michael or is that your tractor?

23   A    It was bought at Sears, I think.

24   Q    Pardon?

25   A    I think he bought it at Sears.

1  Q     But who bought it?

2  A     I'm not really sure.

3  Q     Other than mowing the grass, what other

4  activities did Michael do around the house?

5  A     He washes the dishes.  I'm trying to

6  think if he did it back then, though.  Back

7  then it was very separated between me

8  bringing the kids home.  As I just told you,

9  his work hours -- and we kind of ate, and he

10  kind of ate, it just felt more separated

11  then.  So I don't know if I can tell you that

12  he did everybody's dishes or he just did his

13  dishes.

14  Q     Well, what would be the arrangements

15  for meals when Michael was working anything

16  other than a day shift?  Well, let me stop

17  there.  When Michael was working the day

18  shift, would he typically have his dinner

19  meal with you and the children?

20  A     It depended on what time we got home,

21  because if I would pick them up at 6:00 from

22  Holy Child, I typically don't get back to my

23  house until 6:30, intermingled in that time

24  was Billy's hockey at Villanova's skating

25  rink.  So we really kind of ran a

44

```
 1   Q      PSCDU stands for what?

 2   A      They call it PSCDU, the Pennsylvania

 3   State Collections Disbursement Unit.  Spoken

 4   as a true domestic attorney.

 5   Q      And you have read Michael's deposition

 6   before today?

 7   A      I read it once.  I did not read it any

 8   time recently, against the advice of John

 9   Kusturiss, who told me to read it, I didn't

10   reread it.

11                   MR. RYAN:  I think that's all

12   I have.

13                   MR. JASKOWIAK:  Just a couple

14   of questions for you.

15                       -  -  -

16                   EXAMINATION

17                       -  -  -

18   BY MR. JASKOWIAK:

19   Q      At the time of this accident, did

20   Michael Daily have any legal custody of the

21   children -- of your two children, Nicole and

22   William?

23   A      No, sir.

24   Q      Did he have any legal responsibility

25   for those children at the time of the
```

45

1    accident?  Legal, in terms of court-imposed

2    duties by way of foster care orders or that

3    kind of thing?

4    A      No, sir.

5    Q      Who was your home insurance company at

6    the time of the accident?

7    A      Allstate Insurance Company.

8    Q      And was your car also insured with

9    Allstate?

10   A      That's correct.

11   Q      Do you get a discount for them both

12   together, is that how it's supposed to work?

13   A      That's how it's -- right.

14   Q      And if you had a second car on that

15   policy, that car ultimately would have also

16   been entitled to a discount?

17   A      Yes.

18   Q      Michael had his own car insurance at

19   the time of this accident?

20   A      That's correct.

21   Q      And he had his own insurance policy for

22   Brookhaven, correct?

23   A      That's correct.  And I might add that

24   it's different companies altogether.

25              MR. JASKOWIAK:  Right.

MAUREEN REPETTO DAVIA

46

```
 1    That's all I have.
 2                    MR. KUSTURISS:  Just a
 3    follow-up clarification.
 4                    - - -
 5                    EXAMINATION
 6                    - - -
 7    BY MR. KUSTURISS:
 8    Q     When you took your household expenses
 9    and divided by four, was that because of you
10    and the two kids and Michael?
11    A     That's correct, me, Nicole and Billy
12    was my responsibility, and Michael paid his
13    part.
14                    MR. KUSTURISS:  Nothing
15    further.
16                    MR. RYAN:  Nothing further.
17                    - - -
18                    (Whereupon, the deposition
19    was concluded at 3:15 p.m.)
20                    - - -
21
22
23
24
25
```